Matter of John Z. (2006 NY Slip Op 52076(U))

[*1]

Matter of John Z.

2006 NY Slip Op 52076(U) [13 Misc 3d 1231(A)]

Decided on October 27, 2006

Family Court, Monroe County

O'Connor, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on October 27, 2006

Family Court, Monroe County
In the Matter of a Proceeding under Article 10 of the Family Court Act John Z. and Chad B., Children under the Age of Eighteen Years Alleged to be Abused and Neglected by Katherine B. and Rory C., Respondents.
NA 15654-05

Alecia J. Spano, Esq., Deputy County Attorney, for and with Petitioner DHS
Adrian J. Burke, Esq., for and with Respondent Katherine B.
Karen Smith Callanan, Esq., for and with Respondent Rory C.
Deral D. Givens, Esq., Law Guardian

Marilyn L. O'Connor, J.
DECISION AND ORDER
The Monroe County Department of Human Services filed a petition under Article 10 of the Family Court Act on December 15, 2005 against both respondents, Katherine B. and her boyfriend, Rory C., alleging that their treatment of the woman's 23-month-old son, Chad (born December 2003), caused him to be an abused and/or neglected child. Additionally, the petition alleged that the facts with respect to Chad required a finding that his older brother John (born May 1999) was derivatively abused and/or neglected. The mother's boyfriend was alleged to be a person legally responsible for the child's care. (Family Court Act, § 1012[g]). 
FACTUAL OVERVIEW
It was undisputed that the respondent boyfriend lived with the respondent mother and the boys at the relevant times and was routinely left to supervise Chad when the respondent mother took her older son to school or therapy. It is alleged that Chad received unexplained injuries, including a clavicle fracture, significant bruising over many parts of his body, and extensive corneal injuries, while in the care of respondents. The petition further alleges that the explanations offered by the respondents were not consistent with the diagnosed injuries. [*2]According to the allegations, these injuries were determined to have most likely occurred over the course of a few weeks starting soon after the respondent boyfriend moved into the household on October 1, 2005.
The bruises ranged, inter alia, from the boy's forehead, to his back, to the very tip of his penis, to the genital area, to the inquinal creases where his legs meet his hips. Respondents claimed that the bruises were caused by Chad's frequent falls, and perhaps by being bounced on his mother's knee; and even by hospital staff treating the boy.
Chad's eyes suffered chemical injuries. The respondents explained the nearly symmetrical corneal injuries by the boyfriend's claim that the toddler managed to vomit into both of his own eyes while lying on his back for a diaper change.
No explanation whatsoever was given for the broken clavicle. Neither respondent claimed any knowledge of the injury-such as seeing the toddler fall or even suffering distress as a result of the break. Indeed, the healing clavicle break was discovered on an x-ray, taken only after the crying little boy was brought to the Emergency Department of Golisano Children's Hospital by his mother.
At the time of his admission to the hospital, Chad had many bruises in many places at various stages of resolution, swollen red lips and eyelids, and he refused to open his tightly shut eyes. The various injuries resulted in the child being hospitalized from Nov. 30, 2005 to December 5, 2005. The diagnosis was "inflicted trauma". The hospital referred the matter for a child abuse investigation, and the petition resulted.
CAUSES OF ACTION FOR ABUSE AND NEGLECT
Based on the factual circumstances, the petition charged respondents with abuse and neglect. First, it alleged that the respondents had abused the boys by inflicting or allowing to be inflicted physical injury other than by accidental means which caused or created a substantial risk of death or serious or protracted disfigurement or protracted impairment of physical or emotional health or protracted impairment of the function of any bodily organ (FCA § 1012[e][i], emphasis added). Alternatively the petition alleged that the respondents had abused the child by creating or allowing to be created a substantial risk of physical injury other than by accidental means which would be likely to cause the same harm (FCA § 1012[e] [ii], emphasis added).
Second, based on the same facts, the petition alleged that the boys were neglected, i.e., children "less than eighteen years of age whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care". It was specifically alleged that the respondents had neglected the children by their failure to provide "adequate supervision and guardianship by unreasonably inflicting or allowing to be inflicted harm or a substantial risk thereof by other acts, conduct, or behavior of a similarly serious nature requiring the aid of the court" (FCA § 1012[f][i][B], emphasis added).
The specific facts alleged regarding abuse and neglect concerned Chad only, but did not allege which of the two respondents was directly responsible for the injuries. The matter went to trial because issues remained as to how the injuries to the child happened and who was directly responsible for them. For the reasons set forth below, the respondents are both found to have neglected Chad (FCA § 1012[f][i][B]), but not to have abused him according to applicable law (FCA § 1012[e][i] and [i]). Derivative neglect is also found as to both respondents, making John a neglected child.
[*3]THE BURDEN OF PROOF
The critical question in this case is whether the preponderance of the evidence established the culpable responsibility of each respondent when the descriptive details of precisely how the injuries occurred never were established by the evidence. This is not a criminal case requiring proof beyond a reasonable doubt. Nor is it a case of severe or repeated abuse requiring a determination based on clear and convincing evidence (Family Court Act, § 1046[b][ii]). Determinations that a child is abused or neglected need only be based on a preponderance of evidence (Family Court Act, § 1046[b][i]).
CREDIBILITY
Credibility is determined by the trier of fact. The petitioner called four witnesses - (1) Dr. Steven Ching, a board certified ophthalmologist; (2) Dr. Ann Lenane, a board certified pediatrician and emergency pediatrician at the Golisano Children's Hospital Pediatric Emergency Department, an associate professor of emergency medicine and pediatrics, and the medical director of the hospital's REACH program (Referral and Evaluation of Abused Children); (3) Elizabeth Opp, a county caseworker who investigates child abuse hotline allegations and works on the IMPACT team (an interdisciplinary team investigating possible abuse cases); and (4) Irene Georganti, a Golisano Children's Hospital social worker.
The respondent mother testified herself and called four other witnesses(1) Dr. Kathleen Hayden, a family doctor who began treating Chad when he was 3 days old; (2) May Williams, co-worker of the respondents at Monroe Ambulance; (3) Chad B., the respondent mother's father; and (4) Andrew Johnson, another co-worker of the respondents.
The respondent boyfriend testified himself and called one other witness(1) Zeke Roberts, fiancé of the respondent mother's sister.
The court credited the testimony of the 5 disinterested witnesses-i.e., the doctors, the county caseworker and hospital social worker, but found the testimony of the other 6 witnesses, i.e., the respondents and their friends and relatives, not credible in significant respects. The testimony of these six sometimes seemed conveniently made up in an elaborate attempt to subvert the truth. Far too many coincidences were required for the exculpatory testimony given by co-workers and the fiancé to be credible. The testimony of Chad's maternal grandfather was not particularly useful. The exculpatory testimony presented explanations for the bruises which were neither credible nor comprehensive enough to account for the great majority of bruises. The testimony meant to be an innocent explanation for the injuries to both of Chad's eyes was so improbable that it cannot be believed. No explanation whatsoever was presented for the broken clavicle. Apparently the desire of the respondents is that the court ignore the broken clavicle despite the undisputed x-ray evidence of a break occurring at least two to three weeks before November 30, 2005 and refuse to be concerned by the timing and sheer quantity of injuries to such a little child, who could neither speak nor defend himself.
A PRIMA FACIE CASE
As stated in section 1046(a)(ii) of the Family Court Act,

In any hearing under this article. . . proof of injuries sustained by a child or of the condition of a child of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the care of such child shall be prima facie evidence of child abuse or neglect, as the case may be, of the parent or other person legally [*4]responsible; . . . .
(E.g., In re Tania J., 147 AD2d 252 [1st Dept 1989]). After the petitioner has made a prima facie showing, the burden shifts to the respondent to offer a satisfactory explanation to rebut the evidence of abuse. A rebuttable but prima facie case of neglect-by someoneis established in the case at bar by the injuries sustained by Chad. The injuries to both eyes, the breaking of a collar bone, the bruises in multiple spots apparently occurring at different times and many of which were hard to imagine occurring from a fall, simply comprise more injuries than one can reasonably believe happened by non-negligent accidents. There was no evidence, however, that
the injuries caused or created a substantial risk of death or protracted disfigurement or protracted impairment of physical or emotional health or the function of an organ. Thus, the evidence did not rise to the level needed for an abuse finding.
As stated in Matter of Brandyn P, 278 AD2d 533, 534-535 (3rd Dept 2000),
Abuse must be established by "a preponderance of the evidence" (Family Ct Act § 1046 [b] [i]) and Family Court Act § 1046 (a) (ii) "provides that a prima facie case of child abuse or neglect may be established by evidence of (1) an injury to a child which would ordinarily not occur absent an act or omission of respondents and (2) that respondents were the caretakers of the child at the time the injury occurred" (Matter of Philip M., 82 NY2d 238, 243).
Chad certainly had injuries which would ordinarily not occur absent an act or omission of someone. His injuries remained unexplained by respondents throughout the trial. As stated in (Matter of Philip M., 82 NY2d 238, 244-245),
Once a prima facie case has been established, respondents may simply rest without attempting to rebut the presumption and permit the court to decide the case on the strength of petitioner's evidence or, alternatively, they may present evidence which challenges the establishment of the prima facie case. Their evidence may, for example, (1) establish that during the time period when the child was injured, the child was not in respondent's care (see, e.g., Matter of Vincent M., 193 AD2d 398, 403); (2) demonstrate that the injury or condition could reasonably have occurred accidentally, without the acts or omissions of respondent (see, e.g., Matter of Eric G., 99 AD2d 835); or (3) counter the evidence that the child had the condition which was the basis for the finding of injury (see, e.g., Matter of Smith, 128 AD2d 784, 785-786).
In accord Matter of Angelique M. (Anonymous), 10 AD3d 659 (2d Dept. 2004).Although motivated to do so, as discussed below, the respondents failed to establish any credible, possible explanation for the various injuries-except the possibility that a few of the bruises were the result of accidental falls.
The timing of all of Chad's injuries alleged in the petition correlated clearly with the short period beginning soon after October 1, 2005, and ending with Nov. 30, 2005, i.e., when the boyfriend moved into the mother's home until Chad went to the hospital. This is significant. Chad's pediatrician, who was called by the mother and was perfectly credible, testified to no injuries of a suspicious nature before the respondents lived together. She presented credible evidence that the respondent mother was a responsible mother prior to the boyfriend moving in. She gave no evidence of anything suspicious before that point, and did not see the child with the injuries at issue here.
[*5]
There simply is nothing in the record of the respondents to make the court conclude that the mother was more likely than the boyfriend to have injured her own little boy, especially in light of the testimony of Chad's own pediatrician. She is responsible, nonetheless, in that she allowed the boyfriend access and control over her children.
Eye Injuries
The court concludes that the mother's boyfriend was the only adult present when the eye injuries occurred. Thus, the respondent boyfriend knows exactly what happened, even though the court does not. However, his explanation that Chad's own vomit injured both eyes almost equally and in the same manner is incredible in light of treating physician Dr. Ching's testimony. Dr. Ching's diagnosis-of a chemical injury (not an abrasion caused mechanically)-is undisputed. Dr. Ching is not only Strong Memorial Hospital's top doctor regarding eye injuries, he is a leading eye doctor for western New York. He treated Chad. He testified that the injuries were caused by a weak acid, and that the bile in vomit could be such an acid. However, he testified he had not seen a case of vomit outside the womb causing such an injury to one eye, let alone two eyes, throughout all his years in the field-i.e., from 1979 forward. He testified that the injuries to the eyes were symmetrical and fortunately superficial. To have such an injury accidentally incurred so evenly byboth eyes makes vomit even less likely to have been the cause than if one eye had suffered chemical injury. In short, the defense, to be successful, would require the court to find that something extremely unlikely to happen did indeed happentwice at the same time. Furthermore, the court would have to conclude that the vomit so completely covered Chad's eyes that symmetrical, chemical injuries to almost the entire area of both eyes resulted from this alleged freak occurrence. This is simply not credible. The evenness of the injuries points to a deliberate, even application of a weak acid to the boy's eyes. Thus, based on a preponderance of the credible evidence, the court concludes that the boyfriend was the person directly responsible for the eye injuries to Chad, while the boy was under his sole and direct supervision. What exactly the boyfriend did-whether, for example, he poured vinegar or some other substance in the child's eyes, intending to either help or hurt-is legally unimportant to the conclusion that he caused the injuries to both eyes and thus is guilty of neglect in this regard. There simply is nothing in the record or the demeanor of the witnesses to make the court conclude that the mother was more likely than the boyfriend to have injured her own little baby in such a manner.
Bruises
The defense sought to convince the court that little Chad fell and bruised many, many parts of his body, including body parts that would be nearly impossible to hurt in a toddler's fall-such as the inquinal creases where his legs join his hips. This theory also fails to take into account that the genital area and the penis, which showed bruising, would have been padded and protected by a diaper. The boy was so badly bruised over so many parts of his body that Dr. Lenane recommended treating him immediately with antibiotics for a rare bacterial infection which could cause overall bruising. This was the worst possible scenario she could ascribe as the cause for his bruised condition when he entered the hospital, and she acted upon it in order to be cautious. With the passage of a little time, the possibility of infection was soon ruled out. The mother suggested that the bruises to the boy's penis might have been created by bouncing the boy (who again would have been protected by a diaper) on her knee. Probably since almost every parent has bounced a child on a knee without injuring the child, the defense offered yet another possible explanation for the penis and genital area bruising. This alternative put the blame on the hospital employees.
The respondents speculated that while treating the boycatheterizing him, and holding him securely for x-rays-the hospital staff caused the bruising. This is not convincing because of [*6]the apparent various ages of Chad's many bruises, because of his initial treatment for a possible disease causing the bruising, and because of Dr. Lenane's experience with many children after x-rays and catheters. She testified she'd never seen bruising like this caused by hospital staff from routine catheters and x-ray procedures, and that usually there is no bruising from a catheter. She also testified that no history given was consistent with the bruising on the boy's penis. Even more damning is the mother's own admission, according to the hospital social worker, that Chad was bruised on his penis and in the genital area before he came to the hospital.
The theory of the defense also seeks to have the court believe that the mom's sister and her fiancé just happened to stop by on the very evening after Chad allegedly vomited into his eyes, hear the water running as the boyfriend was bathing Chad, and walk right in to the home. According to the fiancé, Zeke Roberts, they allegedly ended up spending the night at the respondents' home on this night before the trip to the hospital, unprepared and without any prior plan to do so, just because they were "tired". Furthermore, the testimony is that the two of them spent an hour of their house-guest time together changing the toddler's diaper and playing with him on the morning of the very day he went to the emergency department. Roberts claimed they played with Chad for an hour on their own even though Chad kept his eyes closed "most of the time". He testified that they were trying to make him laugh as he seemed "upset". He does not even suggest that they tried to get help from the mother or her boyfriend for little Chad. His testimony is simply unbelievable. These coincidental"facts" allowed the fiancé to testify, supposedly from his personal and timely knowledge, that the little boy was not bruised before he went to the hospital and to confirm that the boyfriend had told him about the boy vomiting into his own eyes on November 29. He conceded he was unaware the mother had admitted bruising existed before she brought Chad to the hospital. Interestingly, no one called the respondent mother's sister to testify.
The defense seeks also to have the court believe that two of the respondents' co-workers-May Williams and Andrew Johnsonhappened to stop by the hospital and check the boy out twice each, and always got to observe the boy's naked body. Williams testified she came
the first time on Nov. 30, 2006, and observed bruising on his back but not his penis and leg, though she looked at those areas. She testified she came a second time for Chad's birthday party at the hospital. This supposedly allowed her to see that bruises had developed while the boy was at the hospital and which must therefore have been caused by the hospital staff. She had an opportunity to see his genital area the second time but said she did not focus on it. The birthday party testimony does not ring true as the boy's birthday was still two weeks away. Similarly, Andrew Johnson managed to go see Chad twice and both times caught a diaper change. He claims to have observed no genital area bruising the first time-but that he saw bruising on the tip of the penis and in the genital area the second time.
Because Williams and Johnson were ambulance workers, their presence at a hospital emergency room was indeed probable, but their credibility is undermined by the too perfect details. Because of their status as employees of the respondent mother's dad, and the reality that they were sometimes supervised on the job by the respondent boyfriend, their testimony would be suspect. The social worker Georganti's credible claim that the mother admitted Chad had genital area bruising when he arrived at the hospital undercuts the two co-workers' entire testimony. The fact that the fiancé's was not credible at all only suggests a coordinated cover-up. The court must conclude that these biased witnesses offered a web of untruths in an effort to protect their friends.
Fortunately, there were witnesses who were not biased and for whom no motivation to falsify testimony has been offered or is apparent.Thus, the credible testimony of the hospital [*7]social worker is consistent with Dr. Lenane's testimony that the nurse's notes (which she reviewed) said the patient presented with multiple bruises to the face, lumbar spine, genital area, penis, and facial swelling.[FN1] Therefore, the pre-existing bruises could not have been caused by catheterizing him at the hospital, and the witnesses who claimed the bruises were not there before Chad went to the hospital are not telling the truth (i.e., co-workers Williams and Johnson, and fiancé Roberts). Dr. Lenane testified credibly and said she had seen many children after x-rays and she could not recall any with bruises like Chad had. She testified that bruising is not usually associated with catheterization, and that there was no history of the child consistent with the bruising she observed on his penis. She specifically testified that the child's bruising could not be caused by a typical fall or by bouncing the diapered child on a knee. She had not seen bruises like Chad's caused by x-ray procedures. She concluded the cause of the injuries was inflicted trauma. She was a witness with the experience, the expertise and the credentials to do so.
Broken collar bone
Any accident or incident resulting in Chad's broken collar bone should have been witnessed and explained. The injured little boy, because he was only 23 months old at the time of the hearing, should have been carefully supervised at all times by some responsible person. Indeed, all the evidence establishes that the little boy was always under the supervision of an adult-the mom, the boyfriend, or the maternal grandfather who provided routine care four days at a time while the mom worked her four-day shifts. Had there been an accident causing a broken clavicle, someone would have known about it and testified about it, particularly in the face of these abuse charges. Because there is no evidence of such an accident, the court finds there was none. To find otherwise would be wholly speculative. The defense, whether by actual collusion or resulting from general denials, appears intended to persuade the court that the 23-month-old boy innocently suffered a serious trauma injury strong enough to break his clavicle through some unexplained, unseen, unheard accident, and incredibly never even acted noticeably injured or in pain from it. Whoever saw or heard the accident which caused the break, or committed the force upon the boy resulting in the broken bone, knows what happened.
Most likely either the mother or her boyfriend witnessed an accident causing Chad's broken bone or caused the break through deliberate force, since there is not a scintilla of evidence for believing that anyone else was culpable. Common sense indicates that the mother, who saw the child even when the boys were with her father for four days at a time, should have observed the child suffering in pain from the injury no matter when it happened. It is also likely, but less likely, that the boyfriend and/or grandfather observed the child's suffering. Since Chad could not yet talk, the child's reaction to the resulting pain could have been conveniently blamed on general baby hurts or fussiness, with the hope that the injury would heal without being noticed by someone who might create a problem. Unfortunately no medical questions were asked regarding the force needed to break Chad's collar bone and how a baby would be expected to react to such a break. (Cf. Matter of Vince M., 193 AD2d 398, where a doctor testified that it was more difficult to break an infant's bones than an adults because of their flexibility.) However, Dr. Lenane stated that the broken clavicle was one thing she considered in making [*8]her diagnosis of "inflicted trauma"-clearly implying the common sense and medical conclusion that the break was inflicted upon Chad.
A "COVER-UP"
"Inflicted trauma" was the very credible diagnosis for Chad and the court concludes it is an accurate diagnosis. The court further concludes, based on the preponderance of the evidence, that the respondent boyfriend caused Chad's eye injuries and is not admitting it. He also may be responsible for inflicting or allowing to be inflicted the majority of the bruises. Thus, he neglected the boy (Family Court Act § 1012[f][i][B]). The respondent mother, because of her continuous involvement with Chad, knew or should have known that her boyfriend caused Chad's eye injuries and perhaps many of his bruises, and should at the very least have known of his unexplained broken collarbone. Even if the mother did not inflict-or allow to be inflicted any of the injuries, she is culpable for covering up the fact that her respondent boyfriend inflicted injuries on her son. (The same would of course be true if the mother had inflicted the injuries, and the boyfriend were helping her cover that up.) Furthermore, both respondents are culpable for letting others participate in the cover-up effort. In re Lonell J., Jr. (242 AD2d 58, 61[1st Dept. 1998]) explains that section 1012 (f)(i)(B) of the Family Court Act is a "catch-all provision" which "clearly contemplates that the instances of neglectful behavior mentioned therein are not an exclusive list." Under the neglect law, actions to cover-up known neglect must qualify as "other acts of a similarly serious nature requiring the aid of the court." (FCA 1012[f][i][B]).[FN2]
LACK OF ADEQUATE SUPERVISION
The court further finds that Katherine B. also neglected Chad by allowing her boyfriend to continue to care for Chad after she realized or should have realized that his care put Chad at risk for injury and imminent harm. (Matter of Angel S. v Nelinda M., 12 Misc 3d 1154A, 819 NYS2d 208 [Fam. Ct. Kings County 2006].) This was a failure to provide adequate supervision and guardianship (Family Court Act, § 1012[f][i][B]). 
DERIVATIVE NEGLECT OF John
Although there was no allegation or evidence that John, the older boy, was directly abused or neglected by the respondents, the treatment of Chad indicates that John's physical, mental or emotional condition was in imminent danger of becoming impaired as a result of the failures of the respondent to exercise a minimum degree care with respect to his well-being (Family Court Act, § 1012[f][i]). As stated in Matter of Ramsay M. (Anonymous) (17 AD3d 678, 679 [2nd Dept 2005]),
"Even in the absence of direct evidence of actual abuse or neglect of a second child, a derivative finding of neglect should be made where the evidence as to the directly abused or neglected child demonstrates such an impaired level of parental judgment as to create a substantial risk of harm for any child in their care, thereby making such a child neglected under Family Court Act § 1012(f)(i)(B)" (Matter of Dutchess County Dept. Of Soc. Servs. [Brittney C.], 242 AD2d 533, 534, 661 NYS2d 670).
In accord, Matter of Peter C., 278 AD2d 911 [4th Dept 2000]; Matter of Tiffany "AA", 268 [*9]AD2d 818 [3rd Dept 2000]; Matter of Vincent M., 193 AD2d 398 [1st Dept 1993], supra ). There was an impaired level of parental judgment here, making it likely that it was only a matter of time until John, too, would be physically and emotionally injured. Accordingly, John shall be found to be a neglected child by reason of derivative neglect (Family Court Act, §§ 1051[a] and 1046[a][i]).
NOW THEREFORE, for the reasons set forth above, it is
FOUND that a prima facie case of abuse has not been presented; and it is further
FOUND that facts sufficient to sustain the petition as to neglect are established, and the child Chad (born December 2003) is a neglected child (Family Court Act, § 1051[a]), neglected by Katherine B., mother, and Rory C., a person legally responsible for the child's care (Family Court Act, § 1012[g]), both of whom failed to provide adequate supervision and guardianship by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, on Chad (Family Court Act, § 1012[f][i][B]); and it is further
FOUND that the respondents Katherine B. and Rory C. neglected Chad by other acts, conduct or behavior of a similarly serious nature requiring the aid of the court, to wit: covering up the fact that Chad was a neglected child (Family Court Act, § 1012[f][i][B]), and it is further
FOUND that facts sufficient to sustain the petition as to John are established, and the child John (born May 1999) is a derivatively neglected child (Family Court Act, §§ 1051[a] and 1046[a][i]), whose physical condition was in imminent danger of becoming impaired (Family Court Act, § 1012[f][i]) as a result of the failure of Katherine B., mother, and Rory C., a person legally responsible for his care, to exercise a minimum degree of care in providing the child with proper supervision or guardianship (Family Court Act, § 1012[f][i][B]); and it is further
ORDERED that the dispositional hearing in this matter shall be held before this Court on ____________ , 2006 at ____AM/PM.
DATED: October 27, 2006_____________________________
Rochester, NY
HON. MARILYN L. O'CONNOR,
FAMILY COURT JUDGE

Footnotes

Footnote 1:The court notes that a doctor's reliance on notes of a nurse, x-rays taken by and read by other trained professionals, and similar records regarding treatment, observation and diagnosis is standard practice in the medical profession.

Footnote 2:Other acts of a similarly serious nature requiring the aid of the court have included deliberately difficult and stressful exchanges of a child for visitation, (In re Catherine "KK", 280 AD2d 732 [3rd Dept 2001]); spousal abuse known to the child (In re Lonell, 242 AD2d 58, supra ; In re Billy Jean, II, 226 AD2d 767 [3rd Dept 1996]); and putting kids repeatedly in and out of foster care, Betty T. v Com'r of Soc. Servs., 210 AD2d 187 [1st Dept 1994]).